UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA PALASI,<br><br>                              Plaintiff,<br><br>v.<br><br>IQ DATA INTERNATIONAL, INC.,<br><br>                              Defendant. | Case No.:  22-cv-01888-AJB-MMP<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Doc. Nos. 44, 50)** |

Before the Court are the cross-motions for summary judgment filed by Plaintiff Andrea Palasi, (Doc. No. 50), and Defendant IQ Data International, Inc. ("IQ Data"), (Doc. No. 44). The motions have been fully briefed, (Doc. Nos. 53–55, & 57), and the matter is suitable for determination on the papers and without oral argument, pursuant to Local Civil Rule 7.1.d.1. Accordingly, the Court hereby **VACATES** the hearing currently set for January 18, 2024, at 2:00 p.m. For the reasons stated herein, the Court **DENIES** Plaintiff's motion for summary judgment, and **GRANTS IN PART AND DENIES IN PART** IQ

Data's motion for summary judgment.

## I.  BACKGROUND

The parties do not dispute the following facts. IQ Data is a professional collection agency which provides services to the apartment industry. IQ Data was authorized to collect debts for two companies, Jefferson at Carmel Mountain and Sure Deposit (the "Original Creditors"), which are not parties to this case.

On June 29, 2018, Plaintiff and her sister, Michele Palasi, jointly entered into a lease agreement to rent a residential apartment from Jefferson at Carmel Mountain. The lease agreement states it is a one-year lease beginning on June 29, 2018, and ending June 28, 2019, and that it "shall **automatically continue as a tenancy from month-to-month upon expiration of the term**." (Doc. No. 50-4 at 2.) Plaintiff claims she vacated her apartment in April 2020, but that her sister remained. Jefferson at Carmel Mountain maintains it did not receive notice of Plaintiff vacating the apartment, and that it retook possession of the apartment in October 2021.

On August 31, 2020, Plaintiff filed for Chapter 7 Bankruptcy. Plaintiff did not list the Original Creditors or IQ Data as creditors in her bankruptcy schedules, believing at the time that she owed no debt to either. Her Chapter 7 discharge became effective December 1, 2020.

On February 4, 2022, the Original Creditors placed debts of $44,520.47 (Jefferson at Carmel Mountain) and $500 (Sure Deposit) with IQ Data, totaling approximately $46,800.00 ("Lease Debt"). The larger balance was associated with the apartment Plaintiff rented with her sister and was for rent, utilities, and damages. The $500 debt owed to Sure Deposit was associated with a bond Sure Deposit paid to Jefferson at Carmel Mountain to compensate it for physical damage caused to the apartment.

IQ Data thereafter sent Plaintiff collection letters which identified the balances owed. Plaintiff did not contact IQ Data directly after receiving the letters. On June 22, 2022, Plaintiff's counsel sent a dispute letter ("Dispute Letter") to TransUnion, a Credit Reporting Agency ("CRA"). IQ Data thereafter received the Dispute Letter from

TransUnion on July 6, 2022. The Dispute Letter included the Bankruptcy Order of Discharge, dated December 1, 2020.

IQ Data investigated the dispute and considered (1) the Order of Discharge; (2) information it had received from the Original Creditors; and (3) a Claims Process Form which stated that as of October 1, 2021, Jefferson at Carmel Mountain and Sure Deposit had claims against Plaintiff, which further stated Plaintiff moved out on "October 1." Plaintiff did not provide any further information to IQ Data. IQ Data conducted an investigation, and the next day, on July 7, 2022, IQ Data responded to TransUnion to confirm the disputed accounts were accurate and requested the CRAs to report Plaintiff's accounts as disputed.

Plaintiff subsequently filed the instant action alleging violations of: (1) the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*; and (2) the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1, *et seq.* (Complaint, Doc. No. 1.)

## II.   LEGAL STANDARD

A court may grant summary judgment when it is demonstrated that there exists no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party seeking summary judgment bears the initial burden of informing a court of the basis for its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the

movant. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *See Estate of Tucker*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotation marks, alterations, and citation omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable, or is not significantly probative . . . ." *See Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). Where cross motions for summary judgment are filed, the court must examine the entire record before ruling on either motion. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).

## III.   REQUEST FOR JUDICIAL NOTICE

Under Federal Rule of Evidence 201, a court may take judicial notice of a fact that is "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

In support of her motion, Plaintiff requests judicial notice of Exhibit 7, the Bankruptcy Noticing Center Certificate of Notice Regarding Notice of Chapter 7 Bankruptcy Case, filed as ECF 6 in *In re Andrea Palasi*, No. 20-04430-LA7 (U.S. Bankr. S.D. Cal. 2020); Exhibit 9, Copy of the Order for Discharge filed as ECF 13 in *In re Andrea Palasi*, No. 20-04430-LA7; and Exhibit 16, Copy of the Docket from *In re Andrea Palasi*, No. 20-04430-LA7. (Doc. No. 51 at 4.)

"Judicially noticed facts often consist of matters of public record, such as prior court proceedings . . . or other court documents." *Botelho v. U.S. Bank, N.A.*, 692 F. Supp. 2d 1174, 1178 (N.D. Cal. 2010) (citation omitted); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (The court "may take judicial notice of court filings and other matters of public record."). While "[a] court may take judicial notice of the existence of matters of public record, such as a prior order or decision," it should not take notice of "the truth of the facts cited therein." *Marsh v. San Diego Cnty.*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006). Accordingly, the Court **GRANTS** Plaintiff's request for judicial notice of the existence of the three documents attached to Plaintiff's Judicial Notice Request, but not of the truth of the facts cited therein.

## IV.   DISCUSSION

### A.   Evidentiary Objections

As an initial matter, IQ Data objects to 35 of Plaintiff's proposed undisputed facts in support of her Motion for Summary Judgment.[1] (Doc. No. 54 at 6–14; *see* Doc. No. 50-

---

[1] Plaintiff also filed evidentiary objections to evidence in IQ Data's Motion for Summary Judgment. (Doc. No. 53-1.) However, it was submitted as a separate document in violation of the Court's Chambers Rules, and thus was stricken. Hon. Anthony J. Battaglia Civ. Chambers R. at II.A, Hearing Dates (June 4, 2021),

5

1 at 7–14.) IQ Data specifically asserts the objected-to facts are not based on the declarant's personal knowledge as required by Federal Rule of Evidence 602. (*Id.* at 6.) Plaintiff's counsel Ahren Tiller states, under penalty of perjury, that the statements in his Declaration are based on personal knowledge as he has "participated in all aspects of discovery in this matter, and have reviewed all discovery responses produced by Defendant[.]" (Declaration of Ahren Tiller in Support of Plaintiff's Motion for Summary Judgment ("Tiller Decl."), Doc. No. 40-3, at 1.)

In moving for or opposing summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Further, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that *would be* [but not necessarily is] admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4) (emphasis added). Therefore, "[d]eclarations by attorneys are sufficient only if the facts stated are matters of which the attorney has knowledge, such as matters occurring during the course of the lawsuit, such as authenticity of a deposition transcript." *Clark v. Cnty. of Tulare*, 755 F. Supp. 2d 1075, 1084 (E.D. Cal. 2010). Under this standard, "when evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)). Given the sheer volume of evidentiary objections, the Court addresses IQ Data's categorically rather than individually.

First, the Court finds the Tiller Declaration attests to factual matters outside the course of litigation and does not adequately establish that Mr. Tiller, in his role as

---

https://www.casd.uscourts.gov/judges/chambers-rules.aspx ("Objections relating to the motion should be set forth in the parties' opposition or reply. Separate statement of objections will NOT be allowed. The inclusion of objections does not expand the page limits set.").

Plaintiff's counsel, has personal knowledge of those matters. For example, Mr. Tiller has not adequately established he has personal knowledge of communications between Jefferson at Carmel Mountain and Michele Palasi, Plaintiff's sister. (*See* Tiller Decl. ¶¶ 1, 2.) As such, the Court **SUSTAINS** IQ Data's objections to paragraphs 6, 7, 10, 12, and 17 of Plaintiff's Statement of Undisputed Facts in support of her Motion for Summary Judgment. (*See* Doc. No. 50-1 at 8–10.)

Second, IQ Data claims certain statements in Plaintiff's Statement of Undisputed Facts are inadmissible on the ground that Plaintiff does not have the personal knowledge to interpret the notations in IQ Data's internal records, or as to Experian's investigation. (Doc. No. 54 at 9.) The Court agrees and thus **SUSTAINS** IQ Data's evidentiary objections as to paragraphs 18 and 20 of Plaintiff's Statement of Undisputed Facts in support of her Motion for Summary Judgment. (*See* Doc. No. 50-1 at 10–11.)

Lastly, IQ Data objects to paragraphs 14, 15, 31, 33, and 34 of Plaintiff's Statement of Undisputed Facts, claiming Plaintiff's proposed facts clearly contradict her prior deposition testimony. (Doc. No. 54 at 10–14.) "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). The Ninth Circuit has fashioned "two important limitations on a district court's discretion to invoke the sham affidavit rule." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009). First, the rule does not apply automatically to every case where a contradictory affidavit is introduced; rather, "the district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* (quoting *Kennedy*, 952 F.2d at 267). Second, "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id.* at 998–99.

### 1.    Statement of Undisputed Fact ¶ 14

In her Statement of Undisputed Facts, Plaintiff states that due to her delinquent balance which in turn lowered her credit score, "she was unable to apply for [a new] apartment as a result." (Doc. No. 50-1 at 9 (citing Declaration of Andrea Palasi ("Palasi

Decl."), Doc. No. 50-2, ¶ 14).) However, in her deposition, Plaintiff states she never applied for any rental properties "[b]ecause [she] was afraid to pull the trigger" because of her credit score. (Deposition of Andrea Palasi ("Palasi Depo."), Doc. No. 44-10, at 30.) Plaintiff went on to state that she had verbal discussions with "a couple of renters here or there or landlords" to see her options about moving. (*Id.*) Plaintiff further asserts that as a result of the Lease Debt being reported to the credit reporting agencies, her credit score dropped significantly. (Palasi Decl. ¶ 14.) However, Plaintiff stated throughout her deposition that she did not know what her credit score was, including before she filed for bankruptcy, after she received the bankruptcy charge, or at the time of her deposition. (Palasi Depo. at 15, 23, 36.) In response, Plaintiff states her testimony does not conflict with her declaration, and rather, it underscores the statement in her declaration. (Doc. No. 57-1 at 7.) The Court disagrees, and finds the inconsistencies between the deposition testimony and subsequent declaration are "clear and unambiguous" and not just "minor inconsistencies that result from an honest discrepancy, mistake, or newly discovered evidence." *Van Asdale*, 577 F.3d at 998–99. Accordingly, the Court **SUSTAINS** IQ Data's objection to the fourteenth paragraph of Plaintiff's Statements of Undisputed Facts pursuant to the sham affidavit rule.

### 2.      Statements of Undisputed Fact ¶¶ 15, 33, 34

IQ Data next objects to Plaintiff's statement that she "was told by more than one leasing agent that having a delinquent rent balance due and owing would prevent her from being approved for an apartment . . . ." (Doc. No. 50-1 at 9.) As discussed above, Plaintiff stated she had verbal discussions with "a couple of renters here or there or landlords" to see her options about moving but did not speak to anyone at "an apartment complex specifically." (Palasi Depo. at 30.) Although Plaintiff did not "recall any specific names of any specific apartment building or people [she] had discussions about submitting a rental application[,]" the Court does not find these statements contradictory. (*Id.*)

IQ Data further objects to Plaintiff's statements regarding the "anxiety, stress, embarrassment, difficulties in her personal relationships, loss of credit, and the lost the

opportunity [sic] to rent a new resident" she experienced as a result of her credit score. (Doc. No. 54 at 13.) Although Plaintiff stated in her deposition that she also experienced these feelings partially due the credit reporting agencies she settled with and her sister, (Palasi Depo. at 34–35), the Court does not find these statements contradict her prior deposition testimony.

Moreover, Plaintiff states she applied for and was issued a new post-bankruptcy credit card with Capital One with a $300 limit. (Doc. No. 50-1 at 13.) Plaintiff further asserts that after Capital One pulled her Transunion credit report and saw the Lease Debt, it refused to increase her credit limit and thereby improve her credit score. (*Id.*) "Thus, as a direct and proximate result . . . , Plaintiff suffered actual damages consisting of a loss of credit, increased costs of credit, and a loss of ability to purchase and benefit from credit." (*Id.*) Plaintiff stated in her prior deposition that she did not have "any special knowledge regarding what goes into a credit card company assessing whether someone should be approved or denied for credit" and did not apply for any rental properties. (Palasi Dep. at 30, 35.) Plaintiff further stated she had not received any credit denial letters. (*Id.* at 30.)

The Court does not find any contradictions in these statements, and thus **OVERRULES** IQ Data's objections to paragraphs 15, 33, and 34 of Plaintiff's Statement of Undisputed Facts.

### B.   Cross-Motions for Summary Judgment[2]

Both parties move for summary judgment on: (1) whether IQ Data knew or should have known the information it reported to the credit reporting agencies was inaccurate under the FCRA and CCRAA; and (2) whether IQ Data conducted a reasonable investigation of Plaintiff's dispute under the FCRA and the CCRAA. (Doc. Nos. 44-1, 50-1.) IQ Data further moves for summary judgment on the issues of damages and whether

---

[2] Because the cross-motions for summary judgment request adjudication of the same issues and contain arguments common to both, the Court will address the motions together, giving due merit to each motion. *See Schutza v. City of San Diego*, No. 313CV2992CABKSC, 2016 WL 11621283, at *2 (S.D. Cal. June 29, 2016).

Plaintiff's section 1785.25(f) claim under the CCRAA is preempted by the FCRA. (Doc. No. 44-1 at 18, 23.)

FCRA section 1681s-2 provides "[r]esponsibilities of furnishers of information to consumer reporting agencies" and outlines two categories of responsibility. 15 U.S.C. § 1681s-2. The first category, under subsection (a), provides a "[d]uty of furnishers to provide accurate information." *Id.* § 1681s-2(a). The second category, under subsection (b), provides "[d]uties of furnishers of information upon notice of dispute." *Id.* § 1681s-2(b). Plaintiff brings her claim pursuant to the second category, under subsection (b).

Subsection 1681s-2(b) obligations are "triggered 'upon notice of dispute'—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009). The code specifically states that after receiving a dispute notice "regarding the accuracy of any information provided by a person to a [CRA]," the furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer [CRA] pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the [CRA];

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . . ; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify[,] . . . (ii) delete[, or] (iii) permanently block the reporting of that item of information [to the CRAs].

15 U.S.C. § 1681s-2(b)(1). The furnishers' duties "arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b)." *Gorman*, 584 F.3d at 1154. Moreover,

the violation must be negligent or willful. *See* 15 U.S.C. §§ 1681n, 1681o. "To prove a negligent violation, a plaintiff must show that the defendant acted pursuant to an objectively unreasonable interpretation of the statute." *Marino v. Ocwen Loan Servicing LLC*, 978 F.3d 669, 673 (9th Cir. 2020) (citation omitted). In her Complaint, Plaintiff alleges both negligent and willful violations of the FCRA.

The parties do not dispute the following: (1) IQ Data is a "furnisher" under the FCRA or a "person" under the CCRAA; (2) Plaintiff notified the CRAs that Plaintiff disputed the reporting as inaccurate; or (3) IQ Data received such disputes from the CRA.

Summary judgment adjudicates entire claims or legal issues, not questions of fact. In large measure, the parties ask this court to determine, as a matter of law, questions that are essentially factual, i.e., the reasonableness of an investigation by IQ Data under all the circumstances, and whether IQ Data had actual or constructive knowledge of the inaccuracy of reported information. These are questions best left to the trier of fact. Notwithstanding the limitation of this Court to adjudicate these factual issues as a matter of law, the Court engages in the following analysis which may be of assistance to the parties in evaluating their respective positions.

### 1.    Inaccurate Reporting

A furnisher of information may violate the FCRA not only by providing a CRA information that "is patently incorrect," but also by providing information that "is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163 (quoting *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998)).

In her motion, Plaintiff asserts the reporting of the Lease Debt was inaccurate because it was a pre-petition claim that was discharged by her no-asset Chapter 7 bankruptcy case. (Doc. No. 50-1 at 17–18.) IQ Data asserts summary judgment in its favor is appropriate here because the Lease Debt is a post-bankruptcy charge and the original creditors were not disclosed in her bankruptcy petition. (Doc. No. 44-1 at 22–23.) IQ Data further argues that even if this Court or the United States Bankruptcy Court were to find

the Lease Debt discharged, IQ Data would have had no way of knowing the Court would reach such a conclusion at the time it received Plaintiff's dispute. (*Id.*)

IQ Data asserts Plaintiff fails to present admissible evidence that the Lease Debt reported by IQ Data was inaccurate. (Doc. No. 54 at 5.) Specifically, Plaintiff did not disclose her landlord as a creditor to the bankruptcy court, and the Order of Discharge specifically states that some debts which the debtor did not properly list are *not* discharged. (Doc. No. 44-1 at 6.) IQ Data further argues there has been no finding in this case that the Lease Debt was discharged, and that "it would have been impossible for IQ Data to have known the reporting was inaccurate based on Plaintiff's dispute letter and the information available to it at the time." (Doc. No. 54 at 15.) Moreover, although Plaintiff claims she moved out in April 2020, her Dispute Letter did not provide any evidence that she informed her landlord that she moved out, that she actually did move out, or that her landlord released her from future financial obligations connected with the apartment. (*Id.* at 5, 16.) Indeed, IQ Data asserts that "even as of May 11, 2021, Jefferson at Carmel Mountain did <u>not</u> have a move out notice on file for Plaintiff and it had addressed several letters to Plaintiff regarding the past due balances." (*Id.* at 23.) The notes on the Claims Process Form further stated that Plaintiff's move-out date was "10-01-22", and IQ Data believed Plaintiff moved out on October 1, 2021. (Doc. No. 44-1 at 8.) IQ Data states that because the Order of Discharge was dated October 1, 2021, the Original Creditors noted that Plaintiff moved out on October 1, and the Original Creditors charged Plaintiff on October 1, 2021—over a year after Plaintiff's bankruptcy filing date, it did not believe the debts were discharged by the bankruptcy court. (*Id.*) Moreover, the Original Creditors do not believe the debts Plaintiff owes were discharged by the Bankruptcy Order and Plaintiff never gave the Original Creditors notice of her bankruptcy filing. (*Id.* at 9–10.)

IQ Data thus argues "there has been no finding that the debt was discharged" and therefore, "IQ Data was reporting accurately at the time the debt was being reported." (Doc. No. 54 at 15.) To further support this argument, IQ Data asserts the cases relied upon by Plaintiff to show that her bankruptcy discharged the entire balance owed to her landlord

are distinguishable, and that even if the Court finds the debt was discharged, "it would have been impossible for IQ Data to have known the reporting was inaccurate based on Plaintiff's dispute letter." (*Id.* at 14–15.) The parties vigorously disagree over whether these facts render IQ Data's reporting inaccurate. Plaintiff insists the Lease Debt was discharged by her Chapter 7 bankruptcy, as supported by California law.

Plaintiff relies on *In re Beezley*, 994 F.2d 1433 (9th Cir. 1993), to support her position that even if a creditor is omitted in a "no-asset Chapter 7 case," that debt is still discharged. (Doc. No. 50-1 at 18.) The Court agrees. In a no-asset case, such as Plaintiff's, the *Beezley* court held that once the case is closed, even if a debtor omitted a debt or creditor from his or her schedules or failed to provide notice, the debt at issue will remain discharged. 994 F.2d at 1434; *see also Medina v. Nat'l Collegiate Student Loan Trust 2006-3*, No. 320CV01912BENMDD, 2021 WL 1541645, at *2 (S.D. Cal. Apr. 20, 2021,) *reconsideration denied* No. 320CV01912BENMDD, 2021 WL 2720083 (S.D. Cal. July 1, 2021); *Sherwin-williams Co. v. Performance Auto Body, Inc.*, No. EDCV 13-00428-VAP (SPx), 2014 WL 12558844, at *6 (C.D. Cal. Jan. 29, 2014).

However, the parties dispute whether the Lease Debt should be considered a pre- or post-petition claim, thus affecting whether the Lease Debt was discharged as a matter of law. IQ Data asserts the charges were post-bankruptcy charges because the Original Creditors charged Plaintiff on October 1, 2021, one year after Plaintiff's bankruptcy finalized. (Doc. No. 54 at 16.) Plaintiff responds that her Lease Debt was discharged along with all of her other debts because the residential lease agreement pre-dated the bankruptcy case by over a year, and she moved out of the apartment pre-bankruptcy. (Doc. No. 57 at 4.) Plaintiff further argues that IQ Data "ignores that at a minimum, there was a large pre-petition balance of $9,922.06 that was due and owing *prior* to Ms. Palasi's bankruptcy filing." (*Id.* at 2–3.) Specifically, Plaintiff contends the amount owed as of September 1, 2020, the day after Plaintiff's Chapter 7 bankruptcy, was $9,922.06, and thus was a pre-bankruptcy balance consisting of pre-bankruptcy debt that should have been discharged in her August 31, 2020 bankruptcy case. (*Id.* at 3.)

13

Plaintiff relies on *In re Castellino Villas, A. K. F. LLC*, 836 F.3d 1028 (9th Cir. 2016), which held that the creditor's claim for attorneys' fees was discharged because the claim arose before the debtor filed its bankruptcy petition, although the attorneys' fees were incurred during litigation and after the confirmation of a Chapter 11 bankruptcy plan. *Id.* at 1031. The court in *In re Castellino* used the "fair contemplation" test, under which "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." *Id.* at 1034 (quoting *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009)). The court ultimately found the attorneys' fees claim was discharged because the parties knew that the prepetition litigation could lead to an award of attorneys' fees. *Id.* at 1037. Plaintiff asserts she "took no affirmative action whatsoever to 'return to the fray' with regards to the apartment" and that under the "fair contemplation" approach, any alleged liability is due to the 2019 lease renewal due to her sister overstaying and failing to pay rent.[3] (Doc. No. 57 at 4.) Plaintiff claims that a "pre-bankruptcy residential lease agreement, especially one where the Plaintiff had already moved out, is clearly one where it is within the contemplation of the parties that it would be breached and post-petition charges may be assessed." (*Id.*)

However, *In re Castellino* does not involve debt created by a lease agreement, and the parties knew before the bankruptcy filing that attorneys' fees could have been awarded depending on the outcome of the litigation. Moreover, although Plaintiff is correct that the lease is rejected unless the debtor assumes the lease pursuant to 11 U.S.C. § 365 (no assumption occurred here), the rejection of a lease is not a termination of a lease. *In re Licea*, No. 2:13–bk–34043 RK, 2018 WL 898221, at *3 (C.D. Cal. Feb. 12, 2018) ("[R]ejection of the lease was not a termination of the lease, but only a breach by the Debtor, and the Landlord was within its rights under state law to enforce the lease as it did

---

[3] The Court notes the "fair contemplation" test is used when analyzing whether a stay violation has occurred, and there is a lack of case law as to whether this test is relevant to an FCRA case. *See In re Paxton*, 596 B.R. 686, 693 (N.D. Cal. 2019) ("It is well settled in Ninth Circuit case law that the proper analysis of whether a stay violation occurred is guided by the 'fair contemplation' approach.").

by filing a lawsuit to collect lost rental income from Debtor's postpetition, postdischarge breach of the lease.") Indeed, cases have consistently found that landlords are entitled to post-petition rent. *Id.*; *In re Leather Factory Inc.*, 475 B.R. 710, 712 (C.D. Cal. 2012); *In re Johnson*, 460 B.R. 328, 332 (S.D. Fl. 2011). Plaintiff has also failed to provide evidence that she moved out of the apartment, that Jefferson at Carmel Mountain received notice of her move-out, or that her landlord released her from future financial obligations connected with the apartment.

Plaintiff has failed to show that IQ Data's reporting was "patently incorrect," or "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163. IQ Data has also failed to show as a matter of law that its reporting was accurate. Thus, the parties' arguments do not warrant summary judgment in either favor on this claim.

### 2. Reasonable Investigation

The Ninth Circuit in *Gorman* addressed the issue of whether section 1681s-2(b)(1)(A) "requires a furnisher to conduct a 'reasonable' investigation." *Id.* at 1155. The court concluded that "[r]equiring furnishers, on inquiry by a CRA, to conduct at least a reasonable, non-cursory investigation comports with the aim of the statute to 'protect consumers from the transmission of inaccurate information about them.'" *Id.* at 1157 (quoting *Kates v. Crocker Nat'l Bank*, 776 F.2d 1396, 1397 (9th Cir. 1985)). Accordingly, the Ninth Circuit explained that "the furnisher's investigation pursuant to § 1681s-2(b)(1)(A) may not be unreasonable." *Id.*

The duty to conduct a reasonable investigation, as previously discussed, arises only after the furnisher receives from a CRA a notice of dispute. 15 U.S.C. § 1681s-2(b)(A). The notice "must include 'all relevant information regarding the dispute that the [CRA] has received from the consumer.'" *Gorman*, 584 F.3d at 1157 (quoting 15 U.S.C. § 1681i(a)(2)(A)). The notice thus provides the furnisher with information on "the nature of the consumer's challenge to the reported debt," and receipt of the notice "gives rise to the furnisher's obligation to conduct a reasonable investigation." *Id.* "The pertinent

question is thus whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." *Id.* However, the Ninth Circuit "emphasize[d] that the requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Id.* at 1161. The Ninth Circuit reiterated that "the reasonableness of an investigation depends on the facts of the particular case, most importantly the CRA's description of the dispute in its notice." *Id.* at 1160 (citing *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004)).

The Ninth Circuit has held that "summary judgment is generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the "reasonable man" standard is thought ordinarily to preclude summary judgment.'" *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 n.12 (1976)). However, the court instructs that "summary judgment is not precluded altogether on questions of reasonableness." *Gorman*, 584 F.3d at 1157. "It is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'" *Id.* (quoting *In re Software Toolworks Inc.*, 50 F.3d at 622); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1332 (9th Cir. 1995) ("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."). Therefore, the Court must consider the sufficiency of IQ Data's investigation in response to Plaintiff's dispute.

IQ Data asserts its investigation was reasonable because it "reviewed the Dispute, the Order of Discharge attached to the Dispute, and the information it received from the original creditors[,]" in addition to a Claims Process Form which stated that as of October 1, 2021, the Original Creditors had claims against Plaintiff for $44,520.47 and $500. (Doc. No. 44-1 at 8–9.) Plaintiff asserts IQ Data negligently and willfully failed to conduct a reasonable investigation because the Lease Debt was fully discharged by Plaintiff's bankruptcy case, and a reasonable investigation would have shown as such. (Doc. No. 53

at 6, 10.)

IQ Data first argues that under *Gorman*, 584 F.3d 1147, it was only required to review its own files, and thus its investigation was reasonable. (Doc. No. 44-1 at 16.) However, this was not *Gorman*'s holding. Rather, the court stated the reasonableness of an investigation under section 1681s-2(b) is "generally a question for a finder of fact." *Id.* The court nonetheless granted summary judgment for defendant because it "did review all the pertinent records in its possession, which revealed that an *initial* investigation had taken place," and because the defendant had "gone outside its own records to investigate the allegations." *Id.* Here, it is not reasonable to infer the review of internal records performed by IQ Data constituted an "investigation" to the degree the court found sufficient in *Gorman*, and it is clear that IQ Data's investigation did not go beyond reviewing the records in its "possession." Finally, it is not clear the parties in *Gorman* disputed as many material facts as the parties do here, or that the facts surrounding the investigation in *Gorman* are reasonably comparable to the facts in this case. Accordingly, *Gorman* does not require a finding as a matter of law that IQ Data's investigation was reasonable.

Plaintiff argues IQ Data's investigation was unreasonable because "[a]t a bare minimum, the lease renewal was a one-year lease entered into in 2019, and being informed it was discharged in a bankruptcy case filed in 2020, IQ [Data] should have at minimum questioned whether all or part of the Lease Debt was discharged." (Doc. No. 53 at 12.) However, as discussed above, there are factual disputes as to whether the Lease Debt was discharged by the 2020 bankruptcy. Moreover, IQ Data asserts "Plaintiff's own interpretation of the bankruptcy discharge order is not proof that the debt was discharged and is not proof that IQ Data's investigation was unreasonable." (Doc. No. 44-1 at 17.) The Court agrees. Plaintiff's interpretation of the bankruptcy order does not offer proof that the Lease Debt is canceled. Further, regarding the alleged pre-petition balance of $9,922.06, IQ Data asserts it did not have a copy of Plaintiff's Exhibit 6 Resident Ledger on July 7, 2022, the date it performed its investigation into Plaintiff's dispute. (Doc. No. 54 at 22.) Indeed, IQ Data did not receive a copy of the Resident Ledger from Plaintiff or her counsel,

17

nor did it receive a copy from any CRA. (*Id.*) IQ Data represents it received the Resident Ledger from Jefferson at Carmel Mountain on January 5, 2023, and thus at the time it performed its investigation in July 2022, it did not review this document because it was not in its possession. (*Id.*)

Plaintiff further asserts that IQ Data should have determined it at least needed more information, and that IQ Data "had more choices than to either verify the entire amount of the Lease Debt, or concede the entire amount of the Lease Debt was discharged in bankruptcy." (Doc. No. 53 at 12.) Indeed, Plaintiff asserts the extent of IQ Data's investigation "was solely to verify the internal IQDI records regarding the 'move out date' (*i.e.*, 'last charge date') against the date Plaintiff filed for bankruptcy." (Doc. No. 50-1 at 27.) Moreover, IQ Data's records show it "received the Dispute Letter on 07/06/22 at 2:21pm, and that the next morning at 7:18am IQDI concluded their 'investigation.'" (*Id.* at 28.) Thus, asserts Plaintiff, IQ Data solely relied on its own internal records without requesting further information, and determined the Lease Debt being recorded was accurate within less than 17 hours. (*Id.*) IQ Data responds that its investigation was reasonable because Plaintiff's dispute letter did not include "a copy of the ledger, any communications between herself and her former landlord, any communications between herself and her former roommate, any evidence to demonstrate the date she moved out, or any of the case law she is now citing to support the debt was discharged regardless of the fact that her landlord charged her after the bankruptcy petition was filed and had no knowledge about her move out or the bankruptcy filing." (Doc. No. 54 at 23.) Thus, asserts IQ Data, it "could have never concluded the balance was inaccurate based on the information available to it at the time." (*Id.*)

With no other evidence to show that IQ Data's investigation was either reasonable or unreasonable as a matter of law, the Court is left only with the general rule that questions of reasonableness are reserved for the jury. *Cf. Gorman*, 584 F.3d 1147 at 1157 (finding that furnisher was entitled to summary judgment on reasonableness when the furnisher submitted detailed evidence explaining how it conducted its investigation to evaluate the

merits of a dispute). The Court therefore **DENIES** the parties' cross-motions for summary judgment as to the reasonableness of its investigation under the FCRA and CCRAA.

### 3.      Willful Violation

As noted above, Plaintiff brings her first and fifth claims based upon willful violations of the FCRA. Statutory and punitive damages are available for willful violations. *Id.* § 1681n(a). Willfulness may be shown by a reckless disregard of a statutory duty. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). "To prove a willful violation, a plaintiff must show not only that the defendant's interpretation was objectively unreasonable, but also that the defendant ran a risk of violating the statute that was substantially greater than the risk associated with a reading that was merely careless." *Marino*, 978 F.3d at 673 (9th Cir. 2020) (citing *Safeco*, 551 U.S. at 57). "That is, the defendant must have taken action involving 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1101 (N.D. Cal. 2016) (quoting *Safeco*, 551 U.S. at 68).

As discussed above, there is a genuine dispute as to whether IQ Data's interpretation of its investigatory obligation under 15 U.S.C. § 1681s-2(b)(1) was objectively unreasonable. Therefore, it cannot be said, as a matter of law, that IQ Data's investigation was not only objectively unreasonable, but that IQ Data ran the risk of violating the statute that was substantially greater than the risk associated with a reading that was merely careless. Moreover, a jury could conclude IQ Data's investigation where it merely reviewed its own file in response to Plaintiff's dispute based on her Chapter 7 bankruptcy was in reckless disregard to its statutory duty—a willful violation of the statute. The Court cannot conclude on this record that IQ Data's violations were not willful as a matter of law. Accordingly, the Parties' cross-motions for summary judgment on whether IQ Data willfully violated the FCRA is **DENIED**.

### 4.      Damages

IQ Data next asserts that even if the Court found evidence of willfulness, Plaintiff has not suffered actual damages caused by IQ Data. (Doc. No. 44-1 at 18.)

A "willful noncompliance [of the FCRA] entitles plaintiff to punitive damages, reasonable costs and fees, as well as either actual damages or statutory damages." *Messano v. Experian Info. Sols., Inc.*, 251 F. Supp. 3d 1309, 1315–16 (N.D. Cal. 2017). A negligent violation of the FCRA, by contrast, "only entitles plaintiff to actual damages and reasonable costs and fees," and requires "the plaintiff to plead actual damages[.]" *Id.* "Actual damages may include damages for humiliation, mental distress, and injury to reputation and creditworthiness, even if the plaintiff has suffered no out-of-pocket losses." *Kim v. BMW Fin. Servs. NA, LLC*, 142 F. Supp. 3d 935, 944 (C.D. Cal. 2015), *aff'd sub nom.* 2017 WL 3225710 (9th Cir. July 31, 2017) (quoting *Roybal v. Equifax*, No. 2:05-cv-01207-MCE (KJM), 2008 WL 4532447, at *4–5 (E.D. Cal. Oct. 9, 2008)) (quotations omitted). "To survive summary judgment on an emotional distress claim under the FCRA, Plaintiff must submit evidence that reasonably and sufficiently explains the circumstances of his injury and does not resort to mere conclusory statements." *Taylor*, 207 F. Supp. 3d at 1105 (quotations and citations omitted).

IQ Data argues it is entitled to summary judgment "because Plaintiff cannot prove that IQ Data's willful violation of the FCRA caused her damages." (Doc. No. 44-1 at 19.) Specifically, IQ Data contends that Plaintiff's damages were caused by herself and others, and "admits that her emotional distress could have been caused by her sister, her former landlord, and the fact that she was unemployed with two children at the time she found out about the debts." (*Id.*) Plaintiff responds it is improper to summarily conclude she has no damages "especially when she has testified in her declaration about the harm caused by [IQ Data]'s conduct . . . in the form of lost credit opportunities . . . and the resulting emotional distress." (Doc. No. 53 at 15.) Plaintiff's declaration that she suffered "anxiety, stress, embarrassment, difficulties in [her] personal relationships, [and] loss of credit" as a result of IQ Data's actions is sufficient to raise a jury question regarding whether she suffered actual damages during the relevant time period. (Palasi Decl. ¶ 25.) Thus, the Court **DENIES** summary judgment on the issue of actual damages.

///

### 5. CCRAA Claims

#### a. CCRAA §§ 1785.25(a) & 1785.31(a)(2)

Plaintiff asserts that because she has established the elements of her FCRA claim, she has also met all the elements of her CCRAA claims as well. (Doc. No. 50-1 at 16.) IQ Data asserts Plaintiff's CCRAA claim for furnishing inaccurate information fails. (Doc. No. 44-1 at 21.)

The CCRAA "provides that [a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." *Carvalho v. Equifax Info. Servs. LLC*, 629 F.3d 876, 888 (9th Cir. 2010) (quoting Cal. Civ. Code § 1785.25(a)). "Because the CCRAA is substantially based on the Federal Fair Credit Reporting Act, judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions." *Id.* at 889 (quoting *Olson v. Six Rivers Nat'l Bank*, 111 Cal. App. 4th 1, 12 (2003)); *see also Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 579-80 (1995) ("a report violates [both the CCRAA and FCRA] when it is misleading or incomplete, even if it is technically accurate"). The Ninth Circuit "operate[s] under the assumption that California courts would interpret the FCRA and CCRAA consistently." *Id.* at 890. The Court thus analyzes the parties' arguments under the rubric of FCRA first and extends the analysis to the CCRAA.

As discussed above, the evidence presented shows there is a triable issue of fact as to whether IQ Data's investigations in response to Plaintiff's dispute letter was reasonable and amounted to a willful FCRA violation. Thus, the Court reaches the same conclusion as to the CCRAA claim and finds there is a genuine issue of fact as to whether IQ Data knew or should have known the information in its file after receiving the dispute letter was inaccurate. Accordingly, the Court **DENIES** the cross-motions for summary judgment as to this CCRAA claim, based upon a willful allegation.

#### b. CCRAA § 1785.25(f)

Plaintiff alleges in her fourth cause of action that IQ Data violated Cal. Civ. Code

21

1   § 1785.25(f) for failing to report accurate information to a CRA. (Complaint, Doc. No. 1,

2   ¶¶ 68–75.) IQ Data asserts that Plaintiff's Section 1785.25(f) claim under the CCRAA is

3   preempted by section 1681s-2 of the FCRA and thus must be dismissed. (Doc. No. 44-1 at

4   23–24 (citing *Carvalho*, 629 F.3d at 888–89).) The Court agrees that under *Carvalho*, the

5   FCRA preempts § 1785.25(f). *Carvalho*, 629 F.3d at 888–89. Thus, the Court **GRANTS**

6   summary judgment in favor of IQ Data as to Plaintiff's fourth claim under § 1785.25(f).

## V.   CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff's motion for summary judgment, (Doc. No. 50), and **GRANTS IN PART AND DENIES IN PART** IQ Data's motion for summary judgment, (Doc. No. 44).


**IT IS SO ORDERED.**

Dated:  January 16, 2024

Hon. Anthony J. Battaglia
United States District Judge